## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER LYNN HUMMEL AND SHAWN DAVID HUMMEL Senior, | CIVIL ACTION |
| Plaintiffs, | No. 2:23-CV-02002-CCW |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Jennifer Lynn Hummel and Shawn David Hummel Senior (collectively, the "*Plaintiffs*"), for themselves and on behalf of all others similarly situated, hereby submit their Class Action Complaint against Wells Fargo Bank, N.A. ("*Wells Fargo*"), as follows:

## INTRODUCTION

Plaintiffs submit this Complaint on behalf of similarly situated residents of Pennsylvania, seeking monetary redress through Pennsylvania's Fair Credit Extension Uniformity Act and the Unfair Trade Practices and Consumer Protection Law (the latter of which serves as the enforcement vehicle of the former).

### *Background on Proceedings in the Sorace Litigation*

1.      The Plaintiffs attempted to intervene in another pending class action involving Wells Fargo's repossession of vehicles in Pennsylvania styled, *Sorace, et al. v. Wells Fargo Bank, N.A.*, E.D. Pa., case no. 20-cv-04318 (the "*Sorace Litigation*").

2.      The Sorace Litigation involves claims against Wells Fargo under the UCC arising from the bank's conduct during its repossession of vehicles from its consumer borrowers. The Plaintiffs are members of a proposed settlement class, to which the court

presiding over that case has granted its preliminary approval.

3. But the Plaintiffs here hold claims against Wells Fargo that do not overlap with those at issue in the Sorace Litigation, which do not depend upon the same set of facts at issue in the Sorace Litigation.

4. Moreover, the Plaintiffs' claims against Wells Fargo are not duplicative of any of the causes of action pleaded by the plaintiffs in the Sorace Litigation.

5. Nevertheless, a significant subset of the settlement class in the Sorace Litigation very likely holds non-repossession claims against Wells Fargo that are substantially identical to the Plaintiffs' claims.

6. For those reasons, and to prevent those further claims against Wells Fargo from being quietly swept away in an agreement to resolve repossession claims, the Plaintiffs sought to intervene in the Sorace Litigation.  *Sorace*, June. 23, 2023, Mot. to Intervene, doc. no. 75.

7. The Plaintiffs did not succeed in their efforts to intervene in the Sorace Litigation.  Instead, that court determined, *inter alia*, that "[t]he Hummels have sufficient interest as members of the class, but denying the Motion to Intervene does not impair their ability to protect their interests. Any substantive challenges can be addressed as objections to the settlement." *Sorace*, Sep. 11, 2023, Mem. Op., doc. no. 83, p.5.

8. Accordingly, the Plaintiffs submitted their timely objections to the proposed class settlement agreement to avoid forfeiture of the distinct claims presented in this class action, a copy of which is attached hereto as *Exhibit A.*

9. On November 17, 2023, unable to intervene in the Sorace Litigation, the Plaintiffs submit commenced this class action on behalf of similarly situated residents of Pennsylvania, seeking monetary, equitable, injunctive, and declaratory relief.

10.     On February 15, 2024, Judge Pappert granted final approval to the proposed settlement agreement and certified the settlement class over the Hummels' Objections.  *Sorace*, doc. nos. 119-20.

11.     On March 15, 2024, the Hummels filed a timely Notice of Appeal from that certification decision.  *Id.* at doc. no. 121.  The Hummels appeal is now pending before the United States Court of Appeals for the Third Circuit at appeal no. 24-1498.

### *The Temporary Bar and Overbroad Release in Sorace Litigation*

12.     The Order Preliminarily Approving Settlement and Providing for Notice, entered in the Sorace Litigation on September 15, 2023, included a "Temporary Bar for all Class Members" which restrained them from "maintaining, commencing, prosecuting, or pursuing… any Released Claim subsumed and covered by the Release in the Agreement."  *Sorace*, W.D. Pa., case no. 20-cv-04318 [doc. no. 85, p.18].  However, that restraint would only become effective "upon expiration of the Opt-Out Deadline."  *Id.*

13.     The referenced Opt-Out Deadline did not occur until December 26, 2023, more than a month after the Plaintiffs commenced this action.  Thus, the commencement of this action could not have violated the Temporary Bar.

14.     On January 18, 2024, Wells Fargo filed its Motion to Enforce Order Preliminarily Approving Settlement in the Sorace Litigation.  *Id.* at doc. no. 97.  Judge Pappert denied that Motion without prejudice on February 15, 2024.  *Id.* at doc. no. 120.  During the January 31, 2024, fairness hearing, Judge Pappert explained "I don't think that's up to me.  I the [sic] judge in the Western District can take that on."  *Transcr.*, 54:2-4.  A copy of the relevant portions from the transcript of that hearing is attached hereto as *Exhibit B.*

15.     On March 4, 2024, the Hummels filed a Motion to Stay Litigation Pending Appeal,

in a good faith effort to avoid potential noncompliance with any directive of Judge Pappert. *Doc. No.* 15. As noted in that Motion, Wells Fargo consented to the requested stay.

16.     On March 6, 2024, this Court denied the Hummels' Motion to Stay, fully setting forth the basis for its decision. *Doc. No.* 17.

### *Basis for Amendment*

17.     On March 14, 2024, Wells Fargo filed its Motion to Dismiss for Failure to State a Claim and supporting brief. *Doc. Nos.* 18-19.

18.     Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), the Hummels are entitled to amend their Complaint "once as a matter of course" within 21 days of service of a motion to dismiss under Rule 12(b). The Hummels now exercise that right.

## PARTIES

19.      Plaintiffs Jennifer Lynn Hummel and Shawn David Hummel Senior are natural persons residing at 2361 East Beckert Avenue in Pittsburgh, Pennsylvania 15212.

20.     Defendant Wells Fargo is a federally chartered bank and is a subsidiary of Wells Fargo & Company. The corporate headquarters for Wells Fargo is located at 101 N. Phillips Ave. in Sioux Falls, South Dakota 57104.

## JURISDICTION AND VENUE

21.     Wells Fargo regularly and systematically conducts business throughout Pennsylvania. Consequently, this Court has general personal jurisdiction over the Defendant.

22.     Subject matter jurisdiction is appropriate in this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) (CAFA). "CAFA authorizes federal jurisdiction over class actions that arise under state law but that involve minimally diverse parties and an aggregate amount in controversy in excess of $5 million." *Erie Ins. Exch. v.*

*Erie Indem. Co.*, 68 F.4th 815, 819 (3d Cir. 2023) *citing* 28 U.S.C. § 1332(d)(2).  Here, jurisdiction arises under CAFA since (i) the cause of action arises under Pennsylvania statutory law; (ii) the Defendant is a citizen of South Dakota, while the named Plaintiffs are citizens of the Commonwealth of Pennsylvania; (iii) the aggregate amount in controversy exceeds $5 million; and (iv) the putative class consists of more than 100 members.

23.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2).

## DEFINITIONS

24.     **21 Error Notice** means a written notice from Wells Fargo to a Borrower or Borrowers, similar in form and subject to the November 19, 2021, notice that Wells Fargo sent to the Plaintiffs.

25.     **23 Error Notice** means a written notice from Wells Fargo to a Borrower or Borrowers, similar in form and subject to the November 7, 2023, notice that Wells Fargo sent to Ronda J. Winnecour, the standing chapter 13 trustee appointed in the Plaintiffs' chapter 13 bankruptcy case.

26.     **24 Error Notice** means a written notice from Wells Fargo to a Borrower or Borrowers, similar in form and subject to the March 14, 2024, notice that Wells Fargo sent to Ronda J. Winnecour, the standing chapter 13 trustee appointed in the Plaintiffs' chapter 13 bankruptcy case.

27.     **Account** means a Borrower's loan account with Wells Fargo arising under a RISC.

28.     **Borrower** means a "Debtor" and "Obligor" (as those terms are defined herein), under a RISC for the purchase of a Motor Vehicle, pursuant to which Wells Fargo became the secured party.

29.     **CAFA** means the Class Action Fairness Act of 2005, 28 U.S.C. § 1332.

30.     **Class** means the putative class of plaintiffs that the representative Plaintiffs intend to represent, as described with further particularity in the "Class Action Allegations" section of this Complaint.

31.     **Consumer Transaction** means a transaction in which (i) an individual incurs an obligation primarily for personal, family, or household purposes, (ii) a security interest secures the obligation, and (iii) the collateral is held or acquired primarily for personal, family, or household purposes.

32.     **Debtor** means a person having an interest, other than a security interest or other lien, in the collateral, whether or not the person is an obligor.

33.     **FCEUA** means Pennsylvania's Fair Credit Extension Uniformity Act.  73 Pa. Stat. Ann. § 2270.1, *et seq.*

34.     **Motor Vehicle:** Except as otherwise stated, the term "Motor Vehicle" means a device in which, upon which, or by which a person or property is or may be transported or drawn upon a public highway, including an automobile, a truck, a sports utility vehicle, a van, a minivan, a camper, a recreational vehicle, a motorcycle, or a truck.  For purposes of this Complaint, the term is not intended to include a semitrailer or manufactured home.

35.     **Obligor** means a person who, with respect to an obligation secured by a security interest in or an agricultural lien and the collateral: (1) owes payment or other performance of the obligation; (2) has provided property other than the collateral to secure payment or other performance of the obligation; or, (3) is otherwise accountable in whole or in part for payment or other performance of the obligation. The term does not include any issuer or nominated person under a letter of credit.

36.     **Relevant Statutory Period** means the period beginning on the date exactly six

years prior to the filing of this Complaint and ending on the date of class certification.

37.    **RISC** means a retail installment sales contract secured by a Motor Vehicle, evidencing a contractual relationship between Wells Fargo and a Borrower pursuant to which the Borrower agrees to make installment payments over time as shown in the RISC for the purchase of the Motor Vehicle.

38.    **UTPCPL** means Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  73 Pa. Stat. Ann. § 201-1, *et seq*.

**FACTS**

39.    On May 1, 2014, the Plaintiffs purchased a 2012 Ford Explorer from Woltz & Wind Ford, Inc. at 2100 Washington Pike in Heidelberg, Pennsylvania 15106.  A copy of the RISC evidencing that purchase is attached hereto as *Exhibit C*.

40.    Wells Fargo became the secured party for the Plaintiffs' Account.

41.    Sometime in 2015, Wells Fargo repossessed the Plaintiffs' Motor Vehicle in Pennsylvania.  The Plaintiffs regained possession of their Motor Vehicle by curing any default and reinstating their loan.

42.    On July 14, 2016, the Plaintiffs filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code.  *In re: Hummel,* Bankr. W.D. Pa., case no. 16-22610-CMB.

43.    Following Wells Fargo's repossession of their vehicle and the Plaintiffs' bankruptcy filing, Wells Fargo sent correspondence to them on November 19, 2021, admitting that it had improperly processed a payment with an incorrect date and then incorrectly assessed and charged a late fee to the account.  A copy of that correspondence is attached hereto as *Exhibit D*.

**STATUTORY VIOLATIONS**

44.    All residents of Pennsylvania are entitled to its statutory protections for Wells

Fargo's acts and omissions in that state.

45.     As detailed herein, the Defendant's conduct relating to the Plaintiffs' Account violated the FCEUA and its enforcement vehicle the UTPCPL, as well as the UTPCPL directly.

### Wells Fargo's Systematic Improper Charges and Miscommunications

#### *The "21 Error Notice"*

46.     Through its November 19, 2021, Error Notice to Plaintiffs, Wells Fargo revealed its pattern and practice of improperly assessing and collecting late fees.

47.     Wells Fargo enclosed a check in the amount of $108.04 with its 21 Error Notice to the Plaintiffs (which the Plaintiffs did not negotiate).

48.     Apologizing for "any inconvenience" it may have caused, Wells Fargo explained that:

> This check includes $100.66 for **late fees that should not have been assessed**.
>
> This check also includes an **additional amount** as **compensation for the time these funds were not available** for use.
>
> If the total amount was less than $5.00, we increased it and issued a check for $5.00.
>
> This payment is in addition to any amount we previously sent.

*Exh. D*, p. 1 (emphasis added).

49.     Confusingly, under the heading "What you need to know," Wells Fargo wrote:

> While **any unpaid fees and/or charges will remain on the account**, to provide the most flexibility for these funds, we sent a check for any **fees and/or charges** that were added to the account **as a result of this error**, whether they were previously paid **or remain unpaid**.  The check amount may be used to pay any unpaid fees and/or charges in the future.

*Id.* (emphasis added).

50.     Under that same "What you need to know" heading, Wells Fargo claimed that its reason for returning the $108.04 in late fees that it incorrectly charged the Plaintiffs had been "to provide **the most flexibility** for these funds," further warning that the Plaintiffs would still owe the "**unpaid fees and/or charges**" which would "**remain on the account**." *Id.* (emphasis added).

51.     Then, as a potential solution to the difficult circumstances it had created for the Plaintiffs (by returning an improper payment of a fee for a charge that it still intended to collect), Wells Fargo suggested that the "check amount may be used to pay any unpaid fees and/or charges in the future." *Id.*

52.     Adding to the confusion it had created, Wells Fargo contended that it had added $7.38 to the improper charge it was refunding, explaining that that amount was "compensation for the time these funds were not available for use."  But Wells offered no explanation of how it determined that $7.38 was the appropriate amount of compensation.

53.     Wells Fargo admitted that its attempt to issue a payment to the Plaintiffs could cause them even further harm, in the form of tax liabilities and the cost of advice from tax professionals.  *Id.* ("You may be responsible for any federal, state, or local taxes associated with a portion of this payment.  We recommend consulting with your tax advisor…").

54.     Upon information and belief, Wells Fargo issued tax forms 1099-C for its payment to the Plaintiffs and those similarly situated, which unfairly increased their tax liability.

55.     Wells Fargo's payment with its 21 Error Notice to the Plaintiffs did not take into account that the Plaintiffs had been debtors in a reorganizational bankruptcy and had channeled payments through their chapter 13 plan.  Consequently, the improper payment itself had been subject to an additional percentage charge imposed by the chapter 13 trustee (such trustee fees are overseen by the United States Trustee and are the primary source of funding for the chapter 13

trustee's operations).  Wells Fargo made no attempt to compensate the Plaintiffs for the additional charges imposed by the chapter 13 trustee arising from Wells Fargo's improperly assessed and collected late fee.

56.     Moreover, Wells Fargo revealed in its letter that it had a pattern and practice of improperly imposing late charges.  The letter included nonapplicable boilerplate style information, demonstrating that Wells Fargo's misconduct was widespread.  For example, Wells explained:

      a.  "If the total amount was less than $5.00, we increased it and issued a check for $5.00." *Id.*

      b.  the improperly charged late fees may have been "previously paid or remain unpaid." *Id.*

      c.  some recipients of the letter may have (i) "received a discharge"; (ii) held accounts that were "not otherwise affirmed"; or (iii) which had been "accepted from discharge."

In sum, the letter that Wells Fargo sent to the Plaintiffs was a form letter, which it attempted to use to conceal its misconduct and avoid liability to its borrowers.

57.     The 21 Error Notice claimed that it was "not a bill or a request for payment as to these customers." *Id.*  Nevertheless, the Notice explained that "any unpaid fees and/or charges [would] remain on the account" and that the enclosed check could "be used to pay any unpaid fees and/or charges…" *Id.*

58.     Thus, the 21 Error Notice was "in connection with the collection of [a] debt," within the meaning of 73 Pa. Stat. Ann. § 2270.4(b).

### *The "23 Error Notice"*

59.     Wells Fargo confirmed its pattern and practice of improperly imposing late charges through its November 7, 2023, correspondence to Ronda J. Winnecour, the standing chapter 13 trustee appointed in the Hummels' chapter 13 bankruptcy case, a copy of which is attached hereto as *Exhibit E*.

60.     While the 23 Error Notice was similar to the notice Wells Fargo sent to the Plaintiffs in 2021, the 23 Error Notice included a payment of $4,778.79, of which $4,080.52 was meant "for any interest and/or other fees that should not have been assessed." *Exh. E*, p. 1.

61.     Wells Fargo further admitted in its 23 Error Notice that "[t]his issue may have contributed to actions taken to repossess the vehicle." *Id.*

62.     According to the 23 Error Notice, it included "an additional amount as compensation for the time these funds were not available for use." *Id.* Presumably, that additional compensation amounted to the remaining $698.27 that did not relate to Wells Fargo's admittedly improper interest and fees. *Id.*

63.     The 23 Error Notice did not contend that it was "not a bill or a request for payment as to these customers."

64.     In fact, the 23 Error Notice was "in connection with the collection of [a] debt," within the meaning of 73 Pa. Stat. Ann. § 2270.4(b).

### The "24 Error Notice"

65.     On March 14, 2024, after the commencement of this case, Wells Fargo sent yet another Error Notice to Trustee Winnecour, a copy of which is attached hereto as *Exhibit F*.

66.     In its 24 Error Notice, Wells Fargo revealed that it had "inadvertently released its lien on the vehicle… on or about 05/23/2022" but that it had continued to accept payments upon its alleged secured claim (notwithstanding the absence of any collateral). *Id.* at 2.

67.     Wells Fargo returned $2,439.62 to Trustee Winnecour, which it claimed represented the "payments that were made since the release of our lien." *Id.*

68.     Unlike its previous Error Notices, Wells Fargo did not any further amount to compensate the Hummels (or the debtors' estate) for the time when the funds were not available

for use.

69.     The 24 Error Notice further explained that Wells Fargo would file an amended proof of claim, seeking to recover from the Hummels as an unsecured creditor.  *Id.*

70.     Consequently, the 24 Error Notice was also "in connection with the collection of [a] debt," within the meaning of 73 Pa. Stat. Ann. § 2270.4(b).

### Violations of Pennsylvania's FCEUA and UTPCPL

71.     In the context of the matters described in this Complaint, Wells Fargo is a "creditor," as that term is defined in the FCEUA (*i.e.*, it is a "person, including agents, servants or employees conducting business under the name of a creditor and within this Commonwealth, to whom a debt is owed or alleged to be owed.").  73 P.S. § 2270.3.

72.     The FCEUA forbids creditors from using any "unfair or unconscionable means to collect or attempt to collect any debt."  73 P.S. § 2270.4(b)(5).  The first example of an unfair or unconscionable collection method enumerated in the act is:

> The **collection of any amount**, **including any** interest, **fee**, charge or expense **incidental to the principal obligation**, unless such amount is **expressly authorized by the agreement creating the debt or permitted by law**.

73 P.S. § 2270.4(b)(6)(i).

73.     Wells Fargo's admittedly improper and incorrectly imposed late charges to the Plaintiffs were not expressly authorized under the RISC, nor were they permitted by law. Consequently, those acts constitute unfair or unconscionable means of collection in violation of the FCEUA.

74.     Further, the FCEUA further defines certain activities of creditors as "unfair or deceptive debt collection act[s] or practice[s]."  73 P.S. § 2270.4(b).  Unfair and deceptive debt collection acts and practices include "any false, deceptive or misleading representation or means

in connection with the collection of any debt." 73 P.S. § 2270(b)(5). The Act includes a non-exclusive list of unfair and deceptive debt collection conduct, including:

> …(ii) The false representation of the character, amount or legal status of any debt.
>
> …(v) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> …(viii) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a debt is disputed.
>
> (ix) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued or approved by any court, official or agency of the United States or any state or which creates a false impression as to its source, authorization or approval.
>
> …(xii) The false representation or implication that documents are legal process.

73 P.S. § 2270.4(b)(5).

75.     Further, Wells Fargo's cryptic, half-explained attempted refund of the late charge it improperly imposed upon the Plaintiffs, along with certain unexplained "compensation" constitutes a false representation of the character, amount, or legal status of a debt in violation of the FCEUA. 73 P.S. § 2270.4(b)(5)(ii).

76.     Wells Fargo's claim that it would continue to charge the returned late fees on the Plaintiffs' account constitutes a threat to take an action that it could not legally take (as it admitted in its letter), in violation of the FCEUA. 73 P.S. § 2270.4(b)(5)(v).

77.     Wells Fargo's claim that it would report the returned payment to the IRS as income to the Plaintiffs constituted a threat to communicate personal credit information to any person, which it knew to have been false, in violation of the FCEUA. 73 P.S. § 2270.4(b)(5)(viii).

78.     Wells Fargo's letter to the Plaintiffs may also have given the appearance of having had the imprimatur of governmental authority, as it provided "tax information" and a section on

"what you need to know," in violation of the FCEUA.  73 P.S. § 2270.4(b)(5)(ix).

79.     Wells Fargo's letter to the Plaintiffs may also have given the appearance of legal process, since it (i) was copied to the Plaintiffs' bankruptcy counsel; and (ii) confusingly stated "As a result of at least one bankruptcy case filing that included the account referenced above…" By falsely employing the appearance of legal process, Wells Fargo violated the FCEUA.  73 P.S. § 2270.4(b)(5)(ix).

80.     For the same reason, Wells Fargo's letter to the Plaintiffs may also have simulated or is falsely represented itself as a document authorized, issued or approved by a court, official or agency of the United States or created a false impression as to its source, authorization or approval in violation of the FCEUA.  73 P.S. § 2270.4(b)(5)(xii).

81.     The foregoing violations of the FCEUA are violations of the UTPCPL, and they are remediable thereunder. 73 P.S. § 2270.5 ("If a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation of …the Unfair Trade Practices and Consumer Protection Law.").

82.     Furthermore, with its Error Notice, Wells Fargo violated the "catch-all" provision of the UTPCPL, which proscribes "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. Ann. § 201-2(4)(xxi).

83.     The Plaintiffs relied upon Wells Fargo's statements and representations in its Error Notice, confusing though they were.  And that reliance was justified under the circumstances. After all, consumer borrowers lack the sophistication of banks, and they are at a considerable disadvantage when it comes to determining the propriety of a bank's fees and charges, the dates with which payments are processed, and the suitability of "compensation" that a bank should pay when it discovers an error.

84.     And Wells Fargo cannot deny that the Plaintiffs suffered an ascertainable loss.   In fact, it attempted to ascertain that loss to the penny and "include[d] an additional amount as compensation."  *Exh. D*, p. 3; *Exh. E*, p. 1.

85.     Moreover, Wells Fargo admitted in its 23 Error Notice that its improper charges "may have contributed to actions taken to repossess the vehicle."  *Exh. E*, p. 1.

86.     The Plaintiffs' ascertainable loss extends beyond Wells Fargo's meager payment for the time that the Plaintiffs were without access to the funds that Wells Fargo had improperly charged.  Wells Fargo could not put the toothpaste back into the tube—instead, the Plaintiffs were entitled to enhanced damages, as further described herein.

87.     Upon information and belief, Wells Fargo's improper issuance of tax forms 1099-C resulted in an ascertainable loss to the Plaintiffs, in the form of increased tax burdens for supposed cancellation of indebtedness.

88.     Because Wells Fargo declined to explain whether the "unpaid fees and/or charges… were previously paid or remain unpaid," the Plaintiffs will require discovery to determine the exact nature and extent of their losses.  *Id.*  But that does not mean that their losses are not ascertainable. If "unpaid fees and/or charges" were to "remain on the account," then those amounts would have triggered additional interest charges and/or expenses needed to pay the remaining charges (*e.g.*, money order fees, postage, service/convenience payment fees, and chapter 13 trustee fees).  *Id.*  If instead, the fees that had been "previously paid," then Wells Fargo's double collection of them meant that the bank had reallocated portions of the Plaintiffs' ordinary debt service payments, resulting in a cascade of other fees and charges that would not have existed but for Wells Fargo's errors.

89.     In this case, and in cases like it, a requirement that a plaintiff establish reliance is

imposed solely to determine the extent to which (if at all) a plaintiff or class member was actually harmed by a defendant's fraudulent or deceptive conduct.

90.    Here, evidence of justifiable reliance upon Wells Fargo's violations of the FCEUA/UTPCPL is not required since (i) this action is brought only by persons who were actually harmed by Wells Fargo's deceptive conduct, and who sustained actual losses as a result of the bank's improper charges; (ii) Wells Fargo obtained money belonging to the Plaintiffs and those similarly situated as a result of its representations and omissions; and/or (iii) the Plaintiffs' losses necessarily flowed from proof of the bank's deception.

91.    In the alternative, the Plaintiffs' justifiably relied upon Wells Fargo's acts and omissions, which caused their ascertainable losses (which acts, omissions, and ascertainable losses are described herein).

92.    Further in the alternative, the Plaintiffs justifiably relied upon Wells Fargo's representations and omissions, and trusted Wells Fargo not to impose improper charges to their accounts, to properly allocate all payments in accordance with the RISC and, in the event of an error, the Plaintiffs justifiably relied upon Wells Fargo to provide them with the full remedial measures that they were entitled to under the law for their ascertainable losses pleaded herein. Moreover, it would be absurd to contend that the Plaintiffs' filing of this action defeated their otherwise viable claims by terminating their justifiable reliance.

## **DAMAGES**

93.    The UTPCPL, which allows for private actions and provides a remedy for Wells Fargo's violations of the FCEUA.  Specifically, the UTPCPL provides that:

> Any person who …suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful… may bring a **private action to recover actual damages or one hundred**

**dollars ($ 100)**, whichever is greater. The **court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($ 100)**, and may provide such additional relief as it deems necessary or proper. **The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.**

73 P.S. § 201-9.2(a).

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action on their own behalf and as representatives of a putative class of plaintiffs pursuant to Rule 23.

95.     Plaintiffs define the Class to include all Borrowers:

(a)     who entered into a RISC to finance the purchase of a Motor Vehicle through a Consumer Transaction;

(b)     to whom Wells Fargo issued any Error Notice, who were actually harmed by Wells Fargo's deceptive conduct, and who sustained actual losses as a result of Wells Fargo imposing fees and/or charges that should not have been assessed;

(c)     within the Relevant Statutory Period and when such Borrowers were residents or domiciliary of the Commonwealth of Pennsylvania.

96.     The Plaintiffs are members of the Class.

97.     Plaintiffs reserve the right to modify the foregoing class definitions to the fullest extent permitted under the law.

98.     The Class is so numerous that joinder of all members is impractical.   Upon information and belief, members of the Class may number in the thousands.

99.     There are questions of law and fact common to all members of the Class.  Common questions of law include whether Wells Fargo's Error Notices violated the provisions of the FCEUA and UTPCPL, and whether all plaintiffs are entitled to recover in accordance with the damages provisions of the UTPCPL rather than be limited to the compensation determined by Wells Fargo.  Common questions of fact include whether Wells Fargo accurately calculated any

amounts it determined should be paid to its Borrowers through its Error Notices, whether Wells Fargo properly accounted for other fees and charges that it imposed solely as a result of the fees and charges that it improperly imposed, and the method by which Wells Fargo calculated the "additional compensation" component of any payment.

100.    The claims or defenses of the representative Plaintiffs are typical of those of all plaintiffs.   The Plaintiffs' claims arise from Wells Fargo's a boilerplate form, which it systematically issued to many its borrowers in a mechanical attempt to avoid liability for its improper accounting, and all are based on the same factual and legal theories.   All plaintiffs financed the purchase of Motor Vehicles in Consumer Transactions, through a RISC under which Wells Fargo became the secured party.

101.    The Plaintiffs will fairly and adequately represent and protect the interests of the Class.   They are represented by the lawyers of Robleto Kuruce, PLLC, a law firm of competent lawyers, experienced in class action matters, commercial litigation, secured transactions, and consumer protection laws.

102.    Questions of law and fact common to the class predominate over questions affecting only individual members.   These questions include the issues identified in paragraph 66, *supra*, as well as:

(a)    whether each plaintiff entered into a RISC for the purchase of a Motor Vehicle;

(b)    whether Wells Fargo become the secured party under such RISC;

(c)    whether Wells Fargo issued an Error Notice to such plaintiffs;

(d)    whether such plaintiffs were residents or domiciliary of the Commonwealth of Pennsylvania when Wells Fargo issued such Error Notices;

(e)    whether the issuance of the Error Notices occurred during the Relevant Statutory Period;

(f)    whether Wells Fargo's conduct violated the FCEUA;

(g)     whether Wells Fargo's conduct violated the UTPCPL; and

(h)     whether the plaintiffs are entitled to recover under the remedial provisions of the UTPCPL.

103.    In addition to the predominance of common legal and factual questions, a class action is superior to all other available methods for fairly and efficiently adjudicating the controversy.  The prosecution of several separate actions by the members of the classes would create a risk of inconsistent or varying adjudications. A class action will serve the goals of judicial economy and ensure uniformity of decision.  Moreover, the following pertinent considerations support class certification, *inter alia*:

(a)     The unnamed plaintiffs do not appear to have an interest in controlling the prosecution of this litigation.  Because most putative class members either do not know that their rights have been violated, they likely have little interest in or ability to prosecute individual actions.  Considering the complexity of the issues involved in this litigation, the unnamed plaintiffs are not likely in a position to expend the effort and expense that would be required to litigate their individual claims.

(b)     The extent and nature of the litigation in which the Plaintiffs have been involved, and in which they will have further involvement further supports certification of the putative class.  As we know, the Plaintiffs attempted to intervene in the Sorace Litigation to preserve the claims at issue here.  Moreover, the Plaintiffs will object to the proposed class settlement in that case to assure that the representative plaintiffs in that case do not waive the claims at issue in this action.

(c)     The desirability of concentrating the litigation in this particular forum is clear.  The court presiding over the Sorace Litigation declined to permit the Plaintiffs from intervening to protect their claims.  Since the Plaintiffs have continuously resided in Pittsburgh, Pennsylvania at all relevant times, the United States District Court for the Western District of Pennsylvania is the appropriate forum for this action.

(d)     Class certification proceedings and any trial would be readily manageable as the claims relate to standardized policies and practices and notices based on standard forms.  There are no unusual legal or factual issues which would cause case management problems outside of those routinely handled in class actions.

104.    Additionally, Wells Fargo has acted or refused to act on grounds generally

applicable to the (putative) classes, thereby making appropriate final relief with respect to the classes.  Specifically, Wells Fargo joined the named plaintiffs in the Sorace Litigation in opposing the Plaintiffs' efforts to intervene in that case—despite that the claims at issue in this case would be subject to release under the terms of their proposed settlement agreement.

105.    Minimum statutory damages can be calculated easily and with mathematical precision and can be easily determined, *inter alia,* by accessing the electronically stored records of Wells Fargo.

106.    The Plaintiffs do not seek double recovery for any claim.

## COUNT 1

**The Class is Entitled to Recover from Wells Fargo Under
the Damages Provisions of the UTPCPL for the Bank's
Violations of the FCEUA and the UTPCPL**

107.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

108.    The actions and omissions by Wells Fargo set forth in this Complaint and below also violated the FCEUA and the UTPCPL.

109.    Wells Fargo violated the FCEUA by, *inter alia*:

    (a)    Collecting amounts, including interest, fees, charges or expenses incidental to the principal obligation, when such amounts were not expressly authorized by an agreement creating the debt nor permitted by law.  73 P.S. § 2270.4(b)(6)(i).

    (b)    Falsely representing the character, amount or legal status of any debt.  73 P.S. § 2270.4(b)(5)(ii)

    (c)    Threatening to take any action that it could not legally take or that it did not intend to take.  73 P.S. § 2270.4(b)(5)(v).

    (d)    Communicating or threatening to communicate to the IRS credit information which it knew or which it should have known was false.  73 P.S. § 2270.4(b)(5)(viii).

    (e)    Using or distributing a written communication which simulated or falsely represented itself to be a document authorized, issued or approved by any court, official or agency of the United States or any state or which created a false

impression as to its source, authorization or approval. 73 P.S. § 2270.4(b)(5)(ix).

(f)  Using of a false representation or deceptive means to collect or attempt to collect any debt. 73 P.S. § 2270.4(b)(5)(x).

(g)  Falsely representing or implying that documents were legal process. 73 P.S. § 2270.4(b)(5)(xii).

110.  The foregoing violations of the FCEUA by Wells Fargo are also violations of the UTPCPL, and they are remediable thereunder. 73 P.S. § 2270.5.

111.  With its Error Notice, Wells Fargo violated the "catch-all" provision of the UTPCPL, which proscribes "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi).

112.  The Plaintiffs justifiably relied upon Wells Fargo's Error Notices.

113.  As a direct and proximate result of the plaintiffs' justifiable reliance the plaintiffs were harmed, and that harm is readily ascertainable from the records of Wells Fargo.

WHEREFORE, Plaintiffs, individually and on behalf of the putative class, request that this Honorable Court grant the following relief as against Defendant as follows:

A.  CLASS CERTIFICATION.  Certify the requested Class, approving the Plaintiffs as class representatives and appointing Robleto Kuruce, PLLC as counsel to the Class.

B.  INJUNCTIVE RELIEF.  Impose a temporary and permanent injunction, preventing Wells Fargo from imposing improper charges and from issuing Error Notices in violation of the FCEUA and UTPCPL.

C.  MONETARY DAMAGES AND ATTORNEYS' FEES.  Award the greater of three times the actual damages sustained by the members of the Improper/Incorrect Fees Class, or $100 to each member; and costs and reasonable attorneys' fees, as provided under 73 P.S. § 201-

9.2(a).

D.   FURTHER AWARD.   Such other and further relief as this Court deems just

and proper.

Dated:  April 4, 2024                                   Respectfully submitted,


                                                  /s/ Aurelius Robleto
                                                 Aurelius Robleto
                                                 PA ID No. 94633
                                                 Renee M. Kuruce
                                                 PA ID No. 314691
                                                 ROBLETO KURUCE, PLLC
                                                 6101 Penn Ave., Ste. 201
                                                 Pittsburgh, PA 15206
                                                 Tel:  (412) 925-8194
                                                 Fax:  (412) 346-1035
                                                 apr@robletolaw.com
                                                 rmk@robletolaw.com

                                                 *Attorneys for Plaintiffs*




## CERTIFICATE OF SERVICE

I certify under penalty of perjury that the foregoing First Amended Class Action Complaint was served upon all counsel of record by email via the ECF notification system on April 4, 2024.


EXECUTED ON: April 4, 2024

                                                  /s/ Aurelius Robleto
                                                 Aurelius P. Robleto
                                                 ROBLETO KURUCE, PLLC
                                                 6101 Penn Ave., Ste. 201
                                                 Pittsburgh, PA 15206